# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-00583-COA

**ARLAUNDRIUS L. JONES A/K/A ARLAUNDRIS JONES A/K/A LIL SIIP**                    APPELLANT

v.

**STATE OF MISSISSIPPI**                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 01/09/2020 |
| TRIAL JUDGE: | HON. DAVID H. STRONG JR. |
| COURT FROM WHICH APPEALED: | PIKE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | SPENCER MARK RITCHIE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ASHLEY LAUREN SULSER |
| DISTRICT ATTORNEY: | DEE BATES |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/21/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE BARNES, C.J., WESTBROOKS AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     A jury of his peers determined a defendant had attacked his elderly neighbor with a stick and found him guilty of aggravated assault and abuse of a vulnerable person. After reviewing his three assignments of error, we affirm.

## BACKGROUND

¶2.     Born in 1940, Ms. Elizabeth Magee was seventy-eight the night she came back from her brother's to her home in Summit. She had lived in her neighborhood for over sixty years, alone after her husband passed of cancer.

¶3. Upon coming home she spotted an SUV at her neighbor Percy Pittman's house. Ms. Magee knew the black-and-white SUV belonged to Mr. Pittman's daughter Landria. But because of the way it was parked—sitting beside the road in the yard—she thought to herself "Landria's car must have quit on her." Ms. Magee knew the younger woman well because she had lived next door to her and even used to do Ms. Magee's hair.

¶4. Ms. Magee had brought back some food and, using a cane to steady herself, began the slow march up the sidewalk to her home. As she headed up the ramp to her front door, she thought she heard someone but didn't see anyone when she looked. She placed her purse in a lawn chair by the door so she could open it.

¶5. But when Ms. Magee put her key in the door, she suddenly turned and saw "this person coming up with a stick . . . in my face," and he "just started beating me[.]" She "was screaming as loud as [she] could[.]"

¶6. After grabbing her purse, which was sitting in the chair beside the door, the man ran to the black-and-white SUV in the neighbor's yard, cranked it, and drove off without his lights on. Frantic, Ms. Magee realized her cell phone was dead but made it inside to call 911.

¶7. Across the street was Ms. Magee's neighbor L.C. Dillon. He had known Mr. Pittman all his life, as well as his daughter Landria. Dillon "had walked out in [his] yard to get something out of [his] car" when he "heard a lot of screaming and yelling." He then walked up to the road and looked "[t]owards Mr. Percy and Ms. [Magee]'s house." And while "the yelling was still going on, Landria's car came, pulled out" from the Pittman house, and started "speeding down the road."

¶8. It wasn't just speeding, recalled Mr. Dillon, "it was just running like racing . . . with the lights out." He thought it was dangerous.

¶9. Mr. Dillon's first thought was that Mr. Pittman, who had been in very poor health, had passed, which brought about the hollering. But after the car went by, he realized "the hollering was still continuing." The neighbor hurried over to Ms. Magee's house and found her "terrified" and crying. He remembered she said to him, "He hit me in the head with a stick of wood or something." Then she said, "He hit me in the head and took my purse," and Mr. Dillon saw "she had a knot on her head." Ms. Magee told him that the man who hit her got into Landria's car.

¶10. Ms. Magee remembered her neighbors began to arrive to help her—Mr. Dillon first, who ran over so fast he didn't have on shoes, and then others. Her head was swollen from the beating, and she was bleeding. A registered nurse from the emergency room of a local hospital later testified that Ms. Magee presented with "multiple bruises to her hands, to her breast, to the back of her head," and "to her shoulders and to the back of her . . . upper back." In the nurse's view, Ms. Magee was "a fragile, old lady—I think that's the reason why she stuck out to me so much—and very distraught and shooken up when she got to us."

¶11. Ms. Magee was given both X-rays and CT scans at the hospital. From where she was grabbed by the assailant, she couldn't raise her arm or sleep on it "for weeks and weeks." She recalled that she had about $14 to $16 in her purse—"Not much, not even a 20."

¶12. Like his wounded neighbor, Mr. Dillon knew the SUV that sped off. He also knew it was Landria's vehicle. Another neighbor arrived, and Mr. Dillon went with him to where

3

they knew Landria was working. When the duo arrived, she told them she was waiting on her husband to come pick her up in her black-and-white SUV.

¶13. Meanwhile the Pike County Sheriff's Office was responding to the 911 call. A lieutenant from the sheriff's office went to Ms. Magee's home. Dispatch had informed the deputies they were looking for "a black male driving a white-on-top and a dark-color-on-bottom vehicle[.]" The lieutenant saw what he believed were fresh tire tracks in the yard of the house next door. He looked for the weapon—Ms. Magee told him it was "a large stick"—but it was dark, and he didn't find one.

¶14. Around the same time, one of the sergeants on duty spotted an "SUV traveling at a high rate of speed[.]" Notably, the Lincoln Mountaineer was white with a dark bottom—the same two-tone scheme dispatch had described. As the sergeant was braking to turn around and follow the vehicle, it cut its headlights off and pulled into a driveway. This almost shook the deputy off the trail, as it was very dark, but he followed the Mountaineer and then initiated a stop. The driver, after some reluctance, complied with the deputy's commands. The driver was Arlaundrius Jones, husband to Landria, the owner of the SUV.

¶15. Jones was later brought in and interviewed by Detective Delre Smith. Jones signed a *Miranda* waiver and told the detective that the Mountaineer belonged to his wife, Landria. When asked how long she had owned the SUV, Jones replied "two or three income taxes." He denied being on the road where Ms. Magee was attacked, even though that was where his home was located. Jones told the detective he was supposed to be picking up his wife from the quick stop where she worked. At various parts of the interview, Jones said he had a

4

friend with him while he was riding around that night, and then that he was alone.

¶16.    According to the detective, "Mr. Jones' demeanor changed" when the investigator began to ask about Ms. Magee and compare her to Jones' grandmother. He "reacted very remorseful, very upset," and began to cry during the interview. Jones began to open up to the detective and tell him that he was having marital difficulties from financial problems and that he had been trying and failing to find a job.

¶17.    Then, while "he was upset and he was crying, Mr. Jones told [the detective] at that point that he was ready to get it over with, and 'It is what it is.'" Jones then discussed with the detective writing an apology letter to Ms. Magee. To the investigator, he "appeared truly remorseful for what he had done." Despite what seemed like a heartfelt meeting, Jones did not confess per se or ever write such a letter.

¶18.    The detective later returned Ms. Magee's purse to her, which had been found and brought in. Although wet and "in a bad state"—it was found in a garbage bag and covered with ants—it did have her personal items in it.

¶19.    Around the same time, Ms. Magee brought the detective a piece of the stick that she believed was used in the attack. It was a roughly five- to six-inch piece of wood. Ms. Magee explained she found it under a wicker bench on her porch right after she was able to pick up her purse. She believed it looked like the stick that was used in the attack.

## COURSE OF PROCEEDINGS

¶20.    At the beginning of 2019, Jones was indicted for the commission of three crimes. First was for armed robbery for stealing Ms. Magee's purse while using a deadly weapon;

5

second was for aggravated assault against her; and last was for felony abuse of a vulnerable adult.

¶21. He was appointed a lawyer, who asked that he be given a psychiatric exam prior to trial. After a review from a qualified physician, who found him able to understand the charges against him and assist in the preparation of his defense, the trial court found Jones competent to stand trial.

¶22. Prior to the beginning of trial, counsel for Jones made an ore tenus motion in limine to exclude the portion of the stick allegedly used to attack Ms. Magee. The victim had apparently brought the stick with her to testify before the grand jury regarding the attack. As defense counsel phrased it, "[w]e have no idea where it came from or anything like that, other than she showed up nine months after the fact and said 'Here. You know, I think this is what I was hit with.'"

¶23. Counsel conceded he received a text message prior to trial informing him that the State intended to introduce the portion of the stick. A photo accompanied the text. He argued this was not sufficient notice that the State would seek to introduce the stick at trial, and "with it not being recovered by the police and it not even being disclosed or turned over . . . for . . . nine months," he asked "that the State be precluded from introducing it." In other words, defense counsel argued the State had committed a discovery violation.

¶24. The trial court inquired whether defense counsel had actual notice the State would seek to introduce the stick, which counsel conceded. Jones' counsel then shifted to an argument regarding authentication, since "the police [didn't] recover it and this is just

6

randomly given to them nine months later[.]" The trial court stated that defense counsel would be given "wide latitude on cross-examination" regarding foundation, and that he would be allowed to expand the scope of his objection at the time the State sought to introduce it.

¶25.    The State brought the stick in for identification purposes during Detective Smith's testimony and sought to admit it during Ms. Magee's testimony. The core objection by defense counsel was that the witness could not "positively" identify the stick; in other words, she was not fully certain it was the stick used in the attack. The detective testified that he believed the size of the stick was consistent with her injuries. However, due to the passage of time and intervening weather, he did not think it would be worth testing for DNA or other forensic evidence. The court admitted the stick into evidence since it was found under the wicker bench where Ms. Magee was attacked and she had testified the stick looked like the weapon used against her.

¶26.    Jones made the decision not to testify. In the end, the jury returned a split verdict. On count one, armed robbery, the fact-finders found Jones not guilty. Yet on counts two and three, for aggravated assault and abuse of a vulnerable adult, the jury found him guilty. The trial court sentenced Jones to twenty years for aggravated assault and fifteen years for abuse of a vulnerable adult; the trial court suspended the last five years on the abuse charge with Jones to be placed on post-release supervision for five years. He was also ordered to pay a $5,000 fine and court costs.

¶27.    Defense counsel filed a motion for a new trial, which was denied by the trial court.

7

Counsel for Jones filed a timely notice of appeal, and the Supreme Court assigned the case to this Court for review.

## DISCUSSION

### I. Jones was not placed into double jeopardy.

¶28. On appeal, counsel for Jones urges he was punished twice for the same actions through his convictions for aggravated assault and abuse of a vulnerable person. In his view, this violates his right to be protected from double jeopardy.

¶29. The prohibition against double jeopardy is a "constitutional guarantee [that] assures three separate protections: (1) protection from a second prosecution for the same offense after acquittal; (2) protection from a second prosecution for the same offense after conviction; and (3) protection from multiple punishments for the same offense." *Turner v. State*, 292 So. 3d 1006, 1029 (¶74) (Miss. Ct. App. 2020). Jones claims that this right to the third protection has been violated. "To determine whether double-jeopardy protections apply, we look to the 'same-elements' test," which "instructs us to determine whether each offense contains an element not present in the other; if not, they are labeled the same offense for double-jeopardy purposes." *Id.* (applying *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).

¶30. Jones was indicted for and convicted of aggravated assault and abuse of a vulnerable person. Both the indictment and the jury instruction on aggravated assault set out that Ms. Magee was "a person who is sixty-five (65) years of age or older." The aggravated-assault statute specifically includes "an aggravating circumstance," which can be applied when a

8

person "is sixty-five (65) years of age or older or a person who is a vulnerable person[.]" Miss. Code Ann. § 97-3-7(14)(c). This increases the possible penalty from twenty years incarceration to thirty years, plus an additional $5,000 fine. *See* Miss. Code Ann. § 97-3-7(2)(b).

¶31. The aggravating circumstance was specifically discussed at sentencing, where the trial court noted the range for a defendant convicted of "aggravated assault of someone over 65 years of age." While the trial court sentenced Jones to twenty years to serve for the aggravated-assault conviction, it did order that he "pay a $5,000 fine" pursuant to subsection (2)(b) of the statute.

¶32. Jones was also convicted of abuse of a vulnerable adult. *See* Miss. Code Ann. § 43-47-19(1) (Rev. 2015). "Any person who willfully inflicts physical pain or injury upon a vulnerable person shall be guilty of felonious abuse or battery, or both, of a vulnerable person and, upon conviction thereof, may be punished by imprisonment in the State Penitentiary for not more than twenty (20) years." Miss. Code Ann. § 43-47-19(3). The Legislature has provided a definition for who might be a "vulnerable person," which includes "a person, whether a minor or adult, whose ability to perform the normal activities of daily living or to provide for his or her own care or protection from abuse, neglect, exploitation or improper sexual contact is impaired due to a mental, emotional, physical or developmental disability or dysfunction, or brain damage or the infirmities of aging." Miss. Code Ann. § 43-47-5(q) (Rev. 2015).

¶33. So in Jones' view, he is being twice punished for the same offense—an attack on a

9

vulnerable person. In response, the State argues that Jones is in effect complaining of a sentence enhancement.

¶34. Enhancements to a sentence do not overlap with the elements of another felony and so, as we held in *Turner*, "sentence-enhancement statutes under which additional terms of imprisonment are imposed do not result in double-jeopardy violations." *Turner*, 292 So. 3d at 1030 (¶79). "The reason is because sentence enhancements do not set out separate elements of the underlying felony." *Id*. (internal quotation marks omitted). Instead, our "Legislature intended for these two punishments to apply to the same offense, therefore there is no double-jeopardy concern." *Taylor v. State*, 137 So. 3d 283, 288 (¶17) (Miss. 2014).

¶35. Both the indictment and the jury instruction on aggravated assault set out that Ms. Magee was "a person who is sixty-five (65) years of age or older." However, age is not an element of the crime of aggravated assault. Instead, it can be used as an "aggravator" per statute to extend the time of incarceration and to impose a monetary fine. Ms. Magee's age was not a prerequisite to a finding that Jones was guilty of aggravated assault. Instead, the age of the victim was considered an aggravating circumstance once the elements of the underlying crime were met, i.e., an enhancement.

¶36. We hold that the "aggravator" of a conviction for attacking a person sixty-five years or older "does not delineate an independent substantive offense" from the crime of aggravated assault, and so does not trigger a violation of double jeopardy. *Lewis v. State*, 112 So. 3d 1092, 1097 (¶15) (Miss. Ct. App. 2013). For when a statute "merely imposes an elevated sentence" for "the commission of a felony, and it does not delineate an independent

10

substantive offense," it will not trigger double jeopardy. *Id*.

¶37.   Accordingly, Jones' convictions for aggravated assault and abuse of a vulnerable person do not violate the prohibition against double jeopardy.

## II.   The admission of the stick was not an abuse of discretion.

¶38.   The second argument made by Jones is that the admission of the portion of the stick allegedly used in the attack on Ms. Magee was an abuse of discretion.   Essentially, his concern is that the State did not lay the proper foundation for admitting the stick into evidence, as it was not proven that the chunk of wood was indeed the weapon used in the assault.

¶39.   This Court reviews a circuit court's decision regarding the admission or exclusion of evidence for an abuse of discretion. *Liddell v. State*, 281 So. 3d 34, 37 (¶5) (Miss. Ct. App. 2019).

¶40.   Jones claims that he "was prejudiced by the admission of the stick," since "[t]he State used the stick as evidence that Jones used such a weapon and the jury found that he had." Taken to its end, Jones' logic is that the stick should have been excluded, and that without the actual stick the jury could not have convicted him of aggravated assault.

¶41.   Yet our jurisprudence does not require the admission of the actual weapon used in the crime to sustain a conviction for aggravated assault.   For instance, in one aggravated-assault case where the victim was attacked by a tire iron, we affirmed the conviction despite the deadly weapon never being found. *Kennedy v. State*, 236 So. 3d 829, 835 (¶31) (Miss. Ct. App. 2017).   "Just because the tire iron was not found does not mean the deadly weapon

11

element was not met," we reasoned, since "[t]he nature of [the victim's] wounds, which had to be closed with staples, indicates she was attacked with a weapon deadly enough to create serious injury to a vital portion of the body," and as a result "[t]he jury could reasonably believe the weapon used by [the defendant] to cause the injury on [the victim's] scalp was a tire iron." *Id*.; *see also Brown v. State*, 269 So. 3d 1262, 1263-64 (¶¶3, 8) (Miss. Ct. App. 2018) (where even though "no gun was ever found," we affirmed a conviction for attempted aggravated assault with a firearm in light of "[p]articles indicative of GSR" on the defendant's hands and photographs "showing glass from the back windshield all over the back seat of the car and a hole in [the victim's] front windshield").

¶42. With or without the stick, the jury could have found that Jones committed aggravated assault on Ms. Magee. The victim testified she was hit with a stick, she was attacked right by a wicker bench on her front porch, and later after the crime she found a portion of a stick under the wicker bench, which a detective reasoned matched the injuries she sustained. Given these facts, it was not an abuse of discretion for the trial court to admit the piece of wood into evidence.

¶43. Furthermore, "[u]nder Mississippi Rule of Evidence 901, the authentication requirement is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *Saunders v. State*, 241 So. 3d 645, 648 (¶10) (Miss. Ct. App. 2018) (citation omitted). After a party "make[s] a prima facie showing of authenticity . . . then the evidence goes to the jury, which ultimately will determine the evidence's authenticity." *Id*. Once the stick was admitted, it was up to the jury to determine if it was

12

authentic. The jury then determined whether to accord any weight to the stick, as "[g]enerally, it is the function of the jury to pass upon the weight and worth of the evidence and to determine the credibility and veracity of the witnesses." *Pate v. State*, 419 So. 2d 1324, 1326 (Miss. 1982); *accord Williams v. State*, 285 So. 3d 156, 160 (¶17) (Miss. 2019) ("When evidence or testimony conflicts, the jury is the sole judge of the weight and worth of evidence and witness credibility.").

### III.    There was sufficient evidence for the conviction.

¶44.    Last, Jones claims the evidence presented at trial was not enough to support the conviction.

¶45.    In evaluating the legal sufficiency of the evidence, "[t]he critical inquiry is whether the evidence shows beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed." *Guss v. State*, 296 So. 3d 734, 737 (¶10) (Miss. Ct. App. 2020). "Under this inquiry, all evidence supporting the guilty verdict is accepted as true, and the State must be given the benefit of all reasonable inferences that can be drawn from the evidence." *Galloway v. State*, 122 So. 3d 614, 665 (¶168) (Miss. 2013). "[I]f any rational trier of fact could have found each and every one of the elements of the crime beyond a reasonable doubt, when viewing the evidence in the light most favorable to the prosecution, the verdict must stand." *Smith v. State*, 250 So. 3d 421, 424 (¶12) (Miss. 2018).

¶46.    The jury was presented with the following uncontested facts. When Ms. Magee returned to her home, she saw a black-and-white SUV next door she knew belonged to her

13

neighbor's daughter Landria. Landria is married to Arlaundrius Jones. While the victim did not see her attacker, she watched him flee in Landria's SUV, a Lincoln Mountaineer, after the assault. Another neighbor, Mr. Dillon, likewise saw the SUV speed off after he heard Ms. Magee screaming. When he went to talk to Landria about the attack, she told him she was waiting on Jones to come pick her up—and that he had the Mountaineer.

¶47. At roughly the same time, Jones was pulled over while driving the SUV. While being interrogated by a detective, according to a witness, Jones "reacted very remorseful, very upset" about Ms. Magee and cried. During the same interview, he admitted to the detective he had financial problems and could not find a job. Jones also indicated that he was going to write an apology letter to Ms. Magee, although he never did.

¶48. Jones argues that there was "no evidence, DNA or by any other means, that Jones ever handled the stick allegedly used in the incident, nor any evidence that Jones ever handled Ms. Magee's purse." Yet that is not the standard; instead, the State has the benefit of all reasonable inferences that can be drawn from the evidence. Given the facts as set out above, there was sufficient evidence to support the jury's verdict.

## CONCLUSION

¶49. As Jones was not placed at risk of double jeopardy, the admission of the stick was not an abuse of discretion, and there was sufficient evidence to sustain his convictions, we affirm the judgment of the circuit court.

¶50. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS**

14

**IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**